FILED
2022 Aug-25  PM 02:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

**TINA HIGGINS,**                   }
                                    }
                                    }
    **Plaintiff,**                  }
                                    }
**v.**                              }    **Case No.:  3:20-cv-01799-MHH**
                                    }
                                    }
**KILOLO KIJAKAZI,**                }
**Commissioner of the**            }
**Social Security Administration,** }
                                    }
    **Defendant.**                  }

## MEMORANDUM OPINION

Tina Higgins seeks judicial review of a final adverse decision of the Commissioner of Social Security pursuant to 42 U.S.C. §§ 405(g) and 1383(c).  The Commissioner denied Ms. Higgins's application for disability insurance benefits based on an Administrative Law Judge's finding that Ms. Higgins was not disabled.  Ms. Higgins argues that the Administrative Law Judge—the ALJ—erred because substantial evidence does not support the ALJ's determination that Ms. Higgins's peripheral neuropathy was a non-severe impairment and because the ALJ did not properly evaluate Ms. Higgins's subjective complaints in accordance with the

Eleventh Circuit's pain standard. After careful review, the Court affirms the Commissioner's decision.

## LEGAL STANDARD FOR DISABILITY UNDER THE SSA

To succeed in her administrative proceedings, Ms. Higgins had to prove that she was disabled. *Gaskin v. Comm'r of Soc. Sec.*, 533 Fed. Appx. 929, 930 (11th Cir. 2013). "A claimant is disabled if [s]he is unable to engage in substantial gainful activity by reason of a medically-determinable impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months." 42 U.S.C. § 423(d)(1)(A).[1] A claimant must prove that she is disabled. *Gaskin*, 533 Fed. Appx. at 930 (citing *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003)).

To determine whether a claimant has proven that she is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or medically equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC")

---

[1] Title II of the Social Security Act governs applications for benefits under the Social Security Administration's disability insurance program. Title XVI of the Act governs applications for Supplemental Security Income or SSI. "For all individuals applying for disability benefits under title II, and for adults applying under title XVI, the definition of disability is the same." https://www.ssa.gov/disability/professionals/bluebook/general-info.htm (lasted visited August 16, 2022).

assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "The claimant has the burden of proof with respect to the first four steps." *Wright v. Comm'r of Soc. Sec.*, 327 Fed. Appx. 135, 136-37 (11th Cir. 2009). "Under the fifth step, the burden shifts to the Commissioner to show that the claimant can perform other jobs that exist in the national economy." *Wright*, 327 Fed. Appx. at 137.

## ADMINISTRATIVE PROCEEDINGS

In 2016, Ms. Higgins protectively applied for disability insurance benefits. (Doc. 9-4, pp. 5, 26). She alleged that her disability began on February 1, 2016. (Doc. 9-4, p. 5). The Commissioner initially denied Ms. Higgins's claim on June 16, 2016. (Doc. 9-4, p. 26). An ALJ reviewed Ms. Higgins's application and issued an unfavorable decision. (Doc. 9-4, pp. 26). The Appeals Council denied Ms. Higgins's request for review. (Doc. 9-4, p. 26). Ms. Higgins did not pursue her 2016 application after the Appeals Council denied her request for review.

Ms. Higgins filed a new application for disability insurance benefits on November 27, 2018. (Doc. 9-4, pp. 25, 35). Initially, Ms. Higgins asserted that she became unable to work on August 27, 2015. (Doc. 9-6, p. 2). Later, Ms. Higgins

amended her alleged onset date to February 22, 2018.  (Doc. 9-4, p. 35; Doc. 9-6, p. 9).  The Commissioner denied Ms. Higgins's application on March 1, 2019.  (Doc. 9-5, p. 5).  Ms. Higgins requested a hearing before an ALJ.  (Doc. 9-5, p. 10).  The ALJ issued an unfavorable decision on June 3, 2020. (Doc. 9-3, pp. 16-29).  Ms. Higgins filed with the Appeals Council exceptions to the ALJ's decision.  (Doc. 9-5, pp. 77-80).  The Appeals Council denied Ms. Higgins's request for review (Doc. 9-3, pp. 2-4), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. § 405(g) and § 1383(c).

## EVIDENCE IN THE ADMINISTRATIVE RECORD

### *Ms. Higgins's Medical Records*

To support her application, Ms. Higgins submitted medical records dating to 2012 that relate to diagnoses and treatment of rheumatoid arthritis, sciatica, osteoarthritis, diabetes, COPD, obesity, peripheral neuropathy, and mood disorders. The Court has reviewed Ms. Higgins's complete medical history and briefly summarizes the following medical records because they are most relevant to Ms. Higgins's arguments in this appeal.

### *The Morrow Clinic, Inc.*

When she first visited the Morrow Clinic in 2012, Ms. Higgins received treatment from Claudette Davis, a CRNP under the supervision of Dr. Keith Morrow.  (Doc. 9-8, p. 74).  Nurse Davis noted that Ms. Higgins had fatigue,

bronchitis, sinusitis, hypothyroidism, and neuropathy. (Doc. 9-8, p. 74). Ms. Higgins was coughing and wheezing. (Doc. 9-8, p. 74).

Over the next two years, Nurse Davis and Dr. Morrow noted that Ms. Higgins was followed by a rheumatologist and indicated in Ms. Higgins's records when she complained of pain.[2] For example, the record from Ms. Higgins's October 2012 visit indicates under the heading "Chief Complaint/Present Illness" that she needed or was using "diabetic shoes" because of her neuropathy diagnosis. (Doc. 9-8, p 70). A record from December 2012 indicates that Ms. Higgins had palpable spasms in her lumbar spine. (Doc. 9-8, p. 69). During a visit in April of 2013, Nurse Davis noted joint tenderness on Ms. Higgins's chart. (Doc. 9-8, p. 66). A similar notation of multiple areas of tenderness secondary to RA, or rheumatoid arthritis, appears in a July 7, 2014 record. (Doc. 9-8, p. 60).

In January of 2015, Nurse Davis noted that Ms. Higgins had stopped working in August of 2014 "due to pain" associated with "RA, neurontin." (Doc. 9-8, p. 58). Physicians use Neurontin, generically gabapentin, to treat nerve pain. https://www.webmd.com/drugs/2/drug-9845-8217/neurontin-oral/gabapentin-

---

[2] Ms. Higgins's records from Dr. Morrow's office and from other providers indicate that Dr. Morrow was Ms. Higgins's primary care physician. (*See*, *e.g.*, Doc. 9-8, p. 159). Ms. Higgins often saw Dr. Morrow for general complaints, but he and Nurse Davis routinely monitored Ms. Higgins's diabetes, back pain, and neuropathy, among other ailments. Dr. Morrow or one of his nurses completed a one-page record for each visit and attached to the record test results from that visit.

oral/details (last visited Aug. 22, 2022).[3]  In April of 2015, Ms. Higgins still was not working "due to RA, neuropathy, pain in back."  (Doc. 9-8, p. 56).  Nurse Davis pinpointed Ms. Higgins's back pain in the lumbar spine and diagnosed sciatica. (Doc. 9-8, p. 56).  A medical record from May 2015 is similar.  (Doc. 9-8, p. 54). Again in December 2015, Ms. Higgins's record reflects tenderness in the lumbar spine in multiple areas.  (Doc. 9-8, p. 52).  Ms. Higgins's record from January 2016 indicates that she still was not able to work because of RA, joint pain, and back pain. (Doc. 9-8, p. 48).  Her physical exam produced findings in her lumbar spine.  (Doc. 9-8, p. 48).

On April 11, 2016, Ms. Higgins saw Nurse Davis.  Ms. Higgins sought treatment for neuropathy and arthritis.  (Doc. 9-8, p. 47).  Ms. Higgins's rheumatologist, Dr. Hunt, was treating Ms. Higgins's RA with Humira.  (Doc. 9-8, p. 47).  Ms. Higgins had multiple areas of tenderness upon palpitation.  Nurse Davis again noted that Ms. Higgins had not worked since August 2014 because of her rheumatoid arthritis, neuropathy, joint pain, and sciatica.  (Doc. 9-8, p. 47).  As of September 16, 2016, Ms. Higgins was still using Humira to treat her RA, and her

---

[3] "Neuropathy, often called peripheral neuropathy, indicates a problem within the peripheral nervous system."  https://my.clevelandclinic.org/health/diseases/14737-neuropathy#:~:text=Neuropathy%20is%20damage%20or%20dysfunction,body%20can%20be%20affected%20too. (last visited Aug. 22, 2022).

physical exam produced findings of multiple areas of joint tenderness upon palpitation.  (Doc. 9-8, p. 45).

At Ms. Higgins's first appointment with Nurse Davis in 2017, Ms. Higgins indicated that Dr. Hunt had added MTX or methotrexate to her treatment for RA.  (Doc. 9-8, p. 42).  An x-ray of Ms. Higgins's spine revealed narrowing and spurs.  (Doc. 9-8, p. 41).  An April 2017 record indicated that Ms. Higgins was taking Humira and MTX weekly for RA.  As of July 2017, Ms. Higgins was taking 5mg of prednisone daily for RA.[4]  She also continued to take Humira and MTX.  Nurse Davis noted that Ms. Higgins had multiple joint deformities and "swan necking" in her hands.  (Doc. 9-8, p. 36).[5]  Nurse Davis included in Ms. Higgins's diagnoses RA and joint pain.  (Doc. 9-8, p. 36).  Ms. Higgins's record from October 2017 indicates that she was taking Humira for RA and Neurontin.  (Doc. 9-8, p. 35).

At a May 10, 2018 appointment with Nurse Davis, Ms. Higgins complained of pain in her lumbar spine that radiated down her right leg.  (Doc. 9-8, p. 32).  Ms.

---

[4]  "Prednisone is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders. Prednisone belongs to a class of drugs known as corticosteroids."  https://www.webmd.com/drugs/2/drug-6007-9383/prednisone-oral/prednisone-oral/details (last visited Aug. 23, 2002).

[5]  "Swan-neck deformity is a bending in (flexion) of the base of the finger, a straightening out (extension) of the middle joint, and a bending in (flexion) of the outermost joint. . . . The most common cause of swan-neck deformity is rheumatoid arthritis."  https://www.merckmanuals.com/home/bone,-joint,-and-muscle-disorders/hand-disorders/swan-neck-deformity (last visited August 18, 2022).

Higgins's list of diagnoses included right-side sciatica, pain in multiple joints, and neuropathy. (Doc. 9-8, p. 32). On July 11, 2018, Ms. Higgins returned to the Morrow Clinic for a diabetes check-up. (Doc. 9-8, p. 31). On July 11, 2018, Ms. Higgins received a Toradol injection for pain.[6] Among others, Ms. Higgins had prescriptions for gabapentin and Humira. (Doc. 9-8, p. 31). Ms. Higgins received another Toradol injection on November 30, 2018. (Doc. 9-8, p. 30).

On February 14, 2019, Ms. Higgins returned to the Morrow Clinic for bilateral hip pain. The pain in her left hip pain was worse than the pain in her right hip. Ms. Higgins received a Toradol injection. (Doc. 9-8, p. 174). During her April 24, 2019, visit to Morrow Clinic, Nurse Davis noted that Ms. Higgins had "multiple joint irregularities." (Doc. 9-8, p. p. 172). Ms. Higgins was referred to a weight loss clinic, and she received an injection of Toradol and prescriptions for, among other things, gabapentin. (Doc. 9-8, p. 72). She was still using Humira for her RA. (Doc. 9-8, p. 72). On August 1, 2019, Ms. Higgins received a Toradol injection at an appointment with the Morrow Clinic to check her diabetes and cholesterol; she had a diagnosis of lumbago, i.e., low back pain. (Doc. 9-8, p. 170).

---

[6] "Toradol [] is a nonsteroidal anti-inflammatory drug most often given by injection. It is indicated for short-term management of moderate to severe acute pain. Over the past several years Toradol has been used intra-articularly similar to cortisone injections for joint pain." https://calsportsortho.com/treatments/toradol-injection/ (last visited August 23, 2022).

On October 24, 2019, Ms. Higgins returned to the Morrow Clinic for a check of her diabetes and hypothyroidism. (Doc. 9-8, p. 168). Ms. Higgins reported fatigue, and Nurse Davis indicated that Ms. Higgins had painful range of motion and multiple joints that were tender to palpation. (Doc. 9-8, p. 168). At her appointment on March 3, 2020, Ms. Higgins had multiple joints that were tender to palpation and painful range of motion. (Doc. 9-8, p. 166). Nurse Davis noted that Ms. Higgins had knotty joints and could not walk to increase her cardio because of rheumatoid arthritis and joint pain. (Doc. 9-8, p. 166). Nurse Davis indicated that Ms. Higgins had diabetes, COPD, hypothyroidism, fatigue, neuropathy, and multiple joint pain due to rheumatoid arthritis. (Doc. 9-8, p. 166).

### *Rheumatology Associates of North Alabama*

Ms. Higgins received treatment for her rheumatoid arthritis from Dr. Robert E. Hunt at Rheumatology Associates of North Alabama from 2017 to 2020. (Doc. 9-8, pp. 6-25, 176-203). On June 14, 2017, Ms. Higgins reported that she had a "very good response to Humira and methotrexate with only slight discomfort in her hands on her current regimen." (Doc. 9-8, p. 25). Ms. Higgins demonstrated "slight discomfort in the MCP's of the right hand but not the left." (Doc. 9-8, p. 25).[7] The

---

[7] "The metacarpophalangeal joint or MP joint, also known as the first knuckle, is the large joint in the hand where the finger bones meet the hand bones. The MCP joint acts as a hinge joint and is vital during gripping and pinching. When arthritis affects the MP joint, the condition is called MP joint arthritis." https://www.louiscatalanomd.com/metacarpophalangeal-joint-arthritis-orthopedic-specialist-new-york.html (last visited August 18, 2022).

remainder of her exam was unremarkable.  Dr. Hunt noted that Ms. Higgins had had two serious pulmonary infections and explained that she was "at increased risk for infections as a consequence of her rheumatoid (doubles the risk) and diabetes (doubles the risk) and COPD (doubles the risk)."  (Doc. 9-8, p. 25).

On December 13, 2017, Ms. Higgins returned to see Dr. Hunt.  (Doc. 9-8, p. 24).  Ms. Higgins reported an "excellent response regarding active disease to methotrexate with Humira." (Doc. 9-8, p. 24).  Dr. Hunt noted that Ms. Higgins had no active synovitis in her peripheral joints.  Dr. Hunt asked Ms. Higgins to return in six months.  (Doc. 9-8, p. 24).

On June 13, 2018, Ms. Higgins returned to Rheumatology Associates with "breakthrough difficulties on Humira every two weeks and methotrexate [] with prednisone[]." (Doc. 9-8, p. 17).  Ms. Higgins reported "20-30 minutes of morning stiffness, 1+ tenderness and puffiness of the writs[,] and 1+ tenderness and puffiness of the MCPs of her hands as well as the knees."  (Doc. 9-8, p. 17).  Dr. Hunt made changes to Ms. Higgins's medication, increasing her Humira to weekly rather than bi-weekly, and asked to see her again in three months.  (Doc. 9-8, p. 17).

Ms. Higgins had an appointment with Dr. Hunt on September 12, 2018.  (Doc. 9-8, p. 11).  Ms. Higgins reported a "very good response upon increasing her Humira from every two weeks to every week in conjunction with methotrexate." (Doc. 9-8, p. 11).  Dr. Hunt noted that Ms. Higgins had "no swelling or tenderness in the small

joints of the hands, wrist, elbows or shoulders." (Doc. 9-8, p. 11). Ms. Higgins had slight swelling in her knees where she also had arthritis but none in her ankles or feet. (Doc. 9-8, p. 11). Ms. Higgins reported a few minutes of morning stiffness, and she had slight discomfort in both knees with crepitus, but the remainder of her skeletal exam was unremarkable. (Doc. 9-8, p. 11).

During her March 6, 2019 visit with Dr. Hunt, Ms. Higgins reported "15-20 minutes of morning stiffness and slight discomfort in the MCP's with no synovitis." (Doc. 9-8, p. 203). Dr. Hunt noted that her RA symptoms were more prominent than they had been previously, and he ordered labs to look for markers of inflammation. (Doc. 9-8, p. 203). Dr. Hunt continued Ms. Higgins on her medication and added 5 mg of prednisone. (Doc. 9-8, p. 203).

Ms. Higgins had an excellent response to her new medication regimen by the time she returned to see Dr. Hunt on July 17, 2019. (Doc. 9-8, p. 202). Still, she reported morning stiffness that lasted 30 minutes, primarily in her knees from osteoarthritis. Ms. Higgins had slight discomfort in her right hand. (Doc. 9-8, p. 202). When Dr. Hunt examined Ms. Higgins on January 15, 2020, he reported that she had an "excellent response to her current regimen with no morning stiffness, no rest stiffness, no recent flares and no difficulties with her medications." (Doc. 98, p 201). Dr. Hunt noted that Ms. Higgins had no synovitis or tenderness in the peripheral joints. (Doc. 9-8, p. 201).

*Dr. Ernest Lee Mollohan, D.O.*

Ms. Higgins saw Dr. Ernest Mollohan for a disability determination examination physical on February 5, 2019. (Doc. 9-8, p. 107).  Ms. Higgins rated her knee pain as 6/10 at its best and 9/10 at its worst; she rated her back pain as 2/10 at its best and 6/10 at its worst; she rated her neuropathy pain as 5/10 at its best and 10/10 at its worst.  (Doc. 9-8, pp. 107-08).  Ms. Higgins reported COPD symptoms; chronic osteoarthritic pain in the lumbar spine, right hip, and knees; and weakness, numbness, tingling in the fingers and her right great toe.  (Doc. 9-8, p. 108).  Ms. Higgins also reported depression, but she denied anxiety and other mood disorders. (Doc. 9-8, p. 108).

After examining Ms. Higgins, Dr. Mollohan reported that Ms. Higgins had normal range of motion in her cervical spine and dorsolumbar spine.  (Doc. 9-8, p. 111).  Ms. Higgins's hips, knees, ankles, shoulders, elbows and forearms, and wrists had normal movement.  (Doc. 9-8, p. 113).  Ms. Higgins's upper extremities had normal sensory perception with touch.  (Doc. 9-8, p. 116).  She had unequal hand grip strength and mild difficulty with her right hand because of stiffness and pain. Ms. Higgins's right lower extremity had tingling sensory perception to touch and pressure.  (Doc. 9-8, pp. 111, 115-16).

Dr. Mollohan indicated that Ms. Higgins could perform bilateral hand/fine finger dexterity repetitive movements, but she exhibited mild difficulty with her

right hand with finger stiffness and 2/10 pain while grasping and lifting small to medium-sized books and turning a doorknob.  Ms. Higgins did not have difficulty picking up coins or paperclips or buttoning her shirt with her left hand. (Doc. 9-8, p. 110). Dr. Mollohan noted that Ms. Higgins had an antalgic gait because she experienced bilateral knee pain and right hip pain while walking.  (Doc. 9-8, p. 110). Dr. Mollohan noted that Ms. Higgins could sit and stand for at least 30 minutes without complaining during the exam, and she could stand from a seated position and get on and off the examination table without difficulty.  (Doc. 9-8, p. 110).  X-rays of Ms. Higgins's knees contained evidence of mild osteoarthritis in both knees. (Doc. 9-8, pp. 105-06).

Dr. Mollohan opined that his clinical exam findings were consistent with Ms. Higgins's complaints, but he noted that Ms. Higgins did not complain of cervical or lumbar radicular pain during the exam.  (Doc. 9-8, p. 110).  Dr. Mollohan noted that his findings were consistent with rheumatoid arthritis, mechanical lumbar back pain, bilateral knee pain, obesity, diabetes mellites Type II, chronic obstructive pulmonary disease, mood disorders, and peripheral neuropathy of the right lower extremity. (Doc. 9-8, p. 110).

*Dr. Johnathan Parker, D.O.*

Ms. Higgins began seeing Dr. Parker as a weight loss patient on May 7, 2019. (Doc. 9-8, p. 159).  Ms. Higgins reported prior diagnoses of hypercholesterolemia,

rheumatoid arthritis, hypothyroidism, vertigo, neuropathy, and ongoing fatigue. (Doc. 9-8, p. 159). Ms. Higgins reported that her blood sugars and rheumatoid pain were uncontrolled. (Doc. 9-8, p. 159). She reported that she was taking Humira and prednisone for RA; her dosage of prednisone had increased from 5 to 20 mg. (Doc. 9-8, p. 159). Ms. Higgins was taking gabapentin for neuropathy. Ms. Higgins denied arthralgia, joint swelling, and gait abnormalities. (Doc. 9-8, p. 160). Under "Social History," Dr. Parker wrote: "Occupation: Patient is disabled." (Doc. 9-8, p. 160). Dr. Parker noted that Ms. Higgins had no clubbing, cyanosis, or edema and that she had "grossly normal motor and strength." (Doc. 9-8, p. 161).

Ms. Higgins had monthly appointments with Dr. Parker until February 27, 2020. (Doc. 9-8, pp. 122-158). According to the records of those visits, at each visit, she denied arthralgia, joint swelling, and an abnormal gait. (Doc. 9-8, pp. 123-24, 127-28, 131-32, 135-36, 139-40, 145, 149, 152-53, 156-57). Dr. Parker consistently indicated that Ms. Higgins had normal sensations throughout her musculoskeletal system with no clubbing, cyanosis, or edema. Dr. Parker indicated also that Ms. Higgins had grossly normal motor strength. (Doc. 9-8, pp. 123-24, 127-28, 131-32, 135-36, 139-40, 145, 149, 152-53, 156-57). In the record for each visit, Dr. Parker reported that Ms. Higgins was disabled. (Doc. 9-8, pp. 123, 127, 131, 135, 139, 144, 148, 152, 156, 160).

*Administrative Hearing*

Ms. Higgins's administrative hearing took place on April 29, 2020.  (Doc. 9-3, p. 34).  Ms Higgins completed the eleventh grade; she testified that she could read, write, and do simple math.  (Doc. 9-3, p. 45).  Ms. Higgins testified that over the years preceding the hearing, she developed trouble concentrating.  (Doc. 9-3, p. 45).  Ms. Higgins testified that she lived with her husband and that she worked as an administrative aide for 13 or 14 years until 2013.  (Doc. 9-3, p. 41).  Ms. Higgins stated that she stopped working because of pain in her back, hips, knees, and legs from her sciatic nerve, rheumatoid arthritis, and diabetic neuropathy.  (Doc. 9-3, pp. 42, 45).

Ms. Higgins testified that she could stand for 30 to 45 minutes in one position before she needed to sit; she could walk 10 to 15 minutes before she needed to stop and rest; and she could sit for about 20 minutes before she needed to get up and move around.  (Doc. 9-3, p. 43).  Ms. Higgins testified that she could not lift objects heavier than eight pounds.  (Doc. 9-3, p. 43).  Ms. Higgins testified that she had trouble opening soda bottles because of arthritis in her hands, especially the right one.  (Doc. 9-3, p. 44).  Ms. Higgins testified that she experienced fatigue and slept a lot during the day, and she had breathing problems because of COPD. (Doc. 9-3, pp. 46-48).  Ms. Higgins stated that her daughter-in-law came to check on her once a week and helped with housework. (Doc. 9-3, p. 48).

Concerning past work, the ALJ pointed out that Ms. Higgins had worked for a construction company as an administrative aide for several years.  (Doc. 9-3, p. 41).  Ms. Higgins testified that she had performed office and clerical duties. (Doc. 9-3, p. 41).  Ms. Higgins testified that while she was employed, she sat at her desk most of the day, and she lifted only normal office items. (Doc. 9-3, pp. 41-42).

Ms. Bramlett, a vocational expert, testified that Ms. Higgins's past work as an administrative aide is found in the DOT under the title of secretary.  (Doc. 9-3, p. 50).  Ms. Bramlett explained that the work of a secretary would be sedentary and skilled with an SVP rating of 6.  (Doc. 9-3, p. 50).  Ms. Bramlett testified that a hypothetical person with Ms. Higgins's age, education, past work experience, and limitations who could perform work at the light exertional level could return to Ms. Higgins's past work. (Doc. 9-3, pp. 50-51).  Ms. Bramlett testified that a second hypothetical person with the same parameters except the person was limited to sedentary work could perform Ms. Higgins's previous work.  (Doc 9-3, p. 51).  Ms. Bramlett testified that a third hypothetical individual with the same parameters as hypothetical person two who was unable to "sustain attention, concentration and pace for more than one hour at a time throughout an eight-hour workday due to a combination of impairments would not be able to perform Ms. Higgins's previous work, and there would be no work available to her.  (Doc. 9-3, p. 51).

## THE ALJ'S DECISION

The ALJ found that Ms. Higgins had not engaged in substantial gainful activity from February 26, 2018, the date of the ALJ's decision on Ms. Higgins's 2016 application, through Ms. Higgins's date last insured, December 31, 2019. (Doc. 9-3, p. 19). The ALJ determined that Ms. Higgins suffered from the severe impairments of rheumatoid arthritis, sciatica, osteoarthritis of the bilateral knees, diabetes mellitus, chronic obstructive pulmonary disease, and obesity. (Doc. 9-3, p. 19). The ALJ also determined that Ms. Higgins suffered from the non-severe impairments of mood disorder and peripheral neuropathy of the right lower extremity. (Doc. 9-3, pp. 19-20). Based on a review of the medical evidence, the ALJ concluded that Ms. Higgins did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P Appendix 1. (Doc. 9-3, p. 21).

Given these impairments, the ALJ evaluated Ms. Higgins's residual functional capacity. (Doc. 9-3, p. 23). The ALJ determined that Ms. Higgins had the RFC to:

> perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant could frequently push/pull with the bilateral lower extremity. She could frequently handle, finger, and feel with the bilateral upper extremities. She could occasionally climb ramps and stairs, but never climb ladders, ropes, or scaffolds. She could occasionally balance, stoop, kneel, and crouch. She could never crawl. She needed to avoid concentrated exposure to extreme cold, dusts, fumes, odors, gases, and areas of poor ventilation. She needed to avoid all exposure to hazardous conditions, such as unprotected heights and dangerous machinery.

(Doc. 9-3, p. 23). "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567(a).

Relying on testimony from the VE, the ALJ found that Ms. Higgins's RFC would not preclude her from performing her past relevant work as a secretary as it generally was performed and actually was performed. (Doc. 9-3, p. 28). Accordingly, the ALJ determined that Ms. Higgins was not under a disability as defined by the Social Security Act. (Doc. 9-3, p. 28).

## STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," a district court "review[s] the ALJ's 'factual findings with deference 'and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001)).*

A district court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a

scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). In evaluating the administrative record, a district court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel*, 631 F.3d at 1178 (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then a district court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, a district court must determine whether the ALJ applied the correct legal standards. If the district court finds an error in the ALJ's application of the law, or if the district court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the district court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## DISCUSSION

### *Ms. Higgins's Severe Impairments*

Ms. Higgins challenges the ALJ's determination of her impairments at step two of the disability analysis. (Doc. 13, p. 10). Ms. Higgins contends that the ALJ erred in characterizing her peripheral neuropathy as non-severe. (Doc. 11, p. 6). Ms.

Higgins argues that her peripheral neuropathy had more than a minimal effect on her ability to engage in work activity.  (Doc. 11, p. 6).  She points to medical records that documented her complaints of her neuropathy and the treatments she received for it.  (Doc. 11, p. 7).  Those records include records from Dr. Morrow's office that indicate that Ms. Higgins was not able to work because of neuropathy, rheumatoid arthritis, multiple joint pain, and sciatica.  (Doc. 11, p. 7; *see* Doc. 9-8, pp. 48, 56, 58).  Ms. Higgins points out that during his May 2019 consultative exam, Dr. Mollohan made findings consistent with her complaints of peripheral neuropathy. (Doc. 11, pp. 8, 9; *see* Doc. 9-8, p. 110).

At step two of the sequential analysis, an ALJ must determine whether "the claimant has any severe impairment." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  "This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison*, 814 F.2d at 588.  Because the ALJ determined that Ms. Higgins had at least one severe impairment, the ALJ properly moved from step two to step three of the disability analysis. *Jamison*, 814 F.2d at 588.

To be sure, neuropathy was a candidate for inclusion in Ms. Higgins's list of severe impairments.  An impairment is not rated severe "'only if the abnormality is

so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience.'" *Williams v. Soc. Security Admin.*, 661 Fed. Appx. 977, 979 (11th Cir. 2016) (quoting *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)). The ALJ found, incorrectly, that Ms. Higgins first was diagnosed with peripheral neuropathy in her right extremity during her March 2019 consultative examination with Dr. Mollohan. (Doc. 9-3, p. 19). The ALJ stated that "[g]eneralized 'neuropathy'" also appeared in Morrow Clinic records from 2018. (Doc. 9-3, p. 19). This narrow view of the evidence overlooks multiple medical records that demonstrate Ms. Higgins's extensive history of neuropathy.

Records from Morrow Clinic demonstrate that Ms. Higgins had a diagnosis of neuropathy as early as 2012. The record from Ms. Higgins's October 2012 visit to the clinic indicates under the heading "Chief Complaint/Present Illness" that she needed or was using "diabetic shoes" because of her neuropathy diagnosis. (Doc. 9-8, p 70). Logic dictates that a patient requires diabetic shoes for a neuropathy diagnosis if the neuropathy affects a lower extremity.[8] Records from Morrow Clinic,

---

[8] Because Ms. Higgins placed the Morrow Clinic medical records associated with her prior application in the administrative record for her second application, the ALJ could consider the older records. When evaluating a pending claim for benefits, an ALJ may consider evidence that was part of the administrative record for a prior application without reopening the prior decision and running afoul of the concept of administrative res judicata. *Wolfe v. Chater*, 86 F.3d 1072, 1079 (11th Cir. 1996). An ALJ may use evidence contained in a prior administrative record to identify "preliminary facts required to assess rationally the question at issue, *i.e.,* whether [the

the physician's office from which Ms. Morrow received treatment for neuropathy, contain information about Ms. Higgins's neuropathy from 2012 through 2020.[9] (Doc. 9-8, p. 66) (April of 2013 describing joint tenderness); (Doc. 9-8, p. 58) (January 2015 record noting Ms. Higgins stopped working in August of 2014 "due to pain" associated with "RA, neurontin"); (Doc. 9-8, p. 56) (April 2015 record indicating Ms. Higgins was not working "due to RA, neuropathy, pain in back"); (Doc. 9-8, p. 47) (April 2016 visit in which Ms. Higgins sought treatment for neuropathy and arthritis); (Doc. 9-8, p. 35) (October 2017 record of treatment with Neurontin); (Doc. 9-8, p. 32) (record listing diagnoses that included pain in multiple

---

claimant] was disabled at the time of the second application." *Rohrich v. Bowen*, 796 F.2d 1030, 1031 (8th Cir. 1986) (stating that ALJ properly summarized medical examinations from 1978, 1979, and 1980 relating to prior application for benefits for purposes of evaluating 1982 application for benefits) (cited with approval in *Wolfe*). An ALJ crosses the line and reopens a prior administrative decision when the ALJ evaluates the merits of the prior disability determination. *Wolfe*, 86 F.3d at 1079; *see also Hamlin v. Barnhart*, 365 F.3d 1208, 1223 n. 15 (10th Cir. 2004) ("While these medical reports date from an earlier adjudicated period, they are nonetheless part of Mr. Hamlin's case record, and should have been considered by the ALJ."); *DeBoard v. Comm'r of Soc. Sec.*, 211 Fed. Appx. 411, 414 (6th Cir. 2006) ("We do not endorse the position that all evidence or medical records predating the alleged date of the onset of disability, or evidence submitted in support of an earlier proceeding, are necessarily irrelevant or automatically barred from consideration by *res judicata*. We recognize that evidence presented at an earlier hearing or predating the onset of disability, when evaluated *in combination with later evidence,* may help establish disability.") (emphasis in *DeBoard*). The ALJ considered the older records, at least minimally, with respect to Ms. Higgins's RFC. (Doc. 9-3, pp. 24-25).

[9] Peripheral neuropathy is a side effect of diabetes. Symptoms of neuropathy include "pain or increased sensitivity, especially at night. Numbness or weakness. Serious foot problems, such as ulcers,        infections,        and        bone        and        joint        pain." https://www.cdc.gov/diabetes/library/features/diabetes-nerve-damage.html (last visited June 6, 2022). Individuals suffering from neuropathy often lose sensation, making it difficult for them to coordinate       complex       movements       like       walking       or       fastening       buttons. https://www.ninds.nih.gov/health-information/patient-caregiver-education/fact-sheets/peripheral-neuropathy-fact-sheet (last visited June 8, 2022).

joints and neuropathy; (Doc. 9-8, p. 172) (April 2019 record noting "multiple joint irregularities" and prescriptions for, among other things, gabapentin); (Doc. 9-8, p. 168) (October 2019 record indicating painful range of motion and multiple joints that were tender to palpation); (Doc. 9-8, p. 166) (March 2020 record – same). Because the ALJ did not fully consider Ms. Higgins's medical records as they relate to her neuropathy during the relevant period, the Court struggles to conclude that substantial evidence supports the ALJ's finding that Ms. Higgins's peripheral neuropathy is a non-severe impairment, but potential error in the finding is harmless at stage two.

If there were error in the ALJ's omission of peripheral neuropathy from Ms. Higgins's list of severe impairments, the error potentially could impact the analysis at step three.  At step three, an ALJ must determine whether an applicant "has a severe impairment or a combination of impairments, whether severe or not, that qualify as a disability.  The ALJ must consider the applicant's medical condition taken as a whole." *Jamison*, 814 F.2d at 588 (citing *Hudson v. Heckler*, 755 F.2d 781, 785 & n.2 (11th Cir. 1985), and *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983)).  The ALJ stated that he considered multiple listings at step three, including Medical Listing 1.02 that concerns dysfunction of joint and Medical Listing 9.00 that concerns diabetes.  (Doc. 9-3, pp. 21-22).  Ms. Higgins has not argued that at step three, the ALJ should have considered listings other than the ones

he included in his opinion.  (Doc. 9-3, pp. 21-22).  Therefore, any error in the ALJ's assessment of Ms. Higgins' neuropathy is harmless.

*Ms. Higgins's Pain Testimony*

Ms. Higgins argues that the ALJ erred in finding that her statements concerning intensity, persistence, and limiting effects of her symptoms were not consistent with the medical evidence and other evidence in the record.  (Doc. 11, p. 11).  The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. May 3, 2019).  When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed [symptoms]."  *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223).  If an ALJ does not properly apply the three-part standard, reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability."  *Holt*, 921

F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)).   If an ALJ rejects a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson*, 284 F.3d at 1225.   The Secretary must accept a claimant's testimony as a matter of law if the ALJ inadequately discredits the testimony.   *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply.  SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4.   Concerning the ALJ's burden when discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are

(or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

In evaluating a claimant's reported symptoms, an ALJ must consider:

(i)   [the claimant's] daily activities;

(ii)  [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv)  [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)   [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r of SSA*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

In reaching his decision, the ALJ considered Ms. Higgins's hearing testimony and the medical evidence. The ALJ found that Ms. Higgins was limited to a

restricted range of sedentary work. (Doc. 12, p. 13). Substantial evidence in the record supports that conclusion.

The ALJ properly considered the nature of the treatments that Ms. Higgins received for her pain and found that the treatment was conservative. (Doc. 12, p. 15). Substantial evidence supports that conclusion. It appears the most aggressive treatment Ms. Higgins received for pain was a Toradol shot. She received five of them. (Doc. 9-8, pp. 30-31, 170, 172, 174). Otherwise, she used prescription medication to manage her pain. She used gabapentin for nerve pain and Humira, MTX, and prednisone for arthritis pain. Though Ms. Higgins's dosage of prednisone increased late in 2019, (Doc. 9-8, pp. 159, 203), Dr. Hunt, Ms. Higgins's rheumatologist, frequently reported that adjustments he made to her medication produced a "very good" or an "excellent" response. (Doc. 9-3, pp. 11, 24, 201, 202). When she struggled with breakthrough symptoms, Ms. Higgins only reported "20-30 minutes of morning stiffness, 1+ tenderness and puffiness of the writs[,] and 1+ tenderness and puffiness of the MCPs of her hands as well as the knees." (Doc. 9-8, p. 17). These symptoms are not consistent with the degree of pain Ms. Higgins related at her administrative hearing, and they do not suggest pain so limiting that it would preclude sedentary work.

The Court is mindful of the fact that Nurse Davis recorded several times in Ms. Higgins's records in 2015 and 2016 that Ms. Higgins left her job because of

pain caused by RA and neuropathy, (Doc. 9-8, pp. 47-48, 54, 56, 58, 166).   The

Court also recognizes that Ms. Higgins reported to Dr. Parker that she did not work

because she was disabled. (Doc. 9-8, pp. 123, 127, 131, 135, 139, 144, 148, 152,

156, 160).  But these are statements that an ALJ does not have to consider.  20 C.F.R.

§ 404.1527(d)(1); *see Coley*, 771 Fed. Appx. at 917 ("Opinions on issues such as

whether the claimant is disabled and the claimant's RFC are not medical opinions

and are reserved to the Commissioner. 20 C.F.R. § 416.927(d). Opinions on issues

reserved to the Commissioner, even when offered by a treating source, are not

entitled to any special significance. *Id.* § 416.927(d)(3)."); *see also Lowery v. Soc.*

*Sec. Admin., Comm'r*, 729 Fed. Appx. 801 (11th Cir. 2018).  The Court has found

no medical record in which a physician has restricted Ms. Higgins's work activities,

though one would not expect to find such restrictions after 2014 when Ms. Higgins

stopped working.  Nurse Davis did note in 2020 that Ms. Higgins had knotty joints

and could not walk to increase her cardio because of rheumatoid arthritis and joint

pain.  (Doc. 9-8, p. 166).

In 2019, Dr. Mollohan found that Ms. Higgins had unequal hand grip strength

but only "mild" difficulty with her right hand secondary to experiencing right hand

and finger stiffness and pain.  (Doc. 9-3, p. 27).  Dr. Mollohan found that Ms.

Higgins had a normal range of motion in all areas, normal rheumatoid arthritis

examination, and only "mild" osteoarthritis of the left and right knee. (Doc. 9-3, p. 27).

The ALJ considered these and several other pieces of medical evidence in the record and adequately explained his reasons for discounting Ms. Higgins's subjective reports of her pain.  To be sure, Ms. Higgins's medical records indicate that she has struggled with and sought treatment for RA pain and nerve pain for years.  Her physical exams have manifested tenderness to palpitation in multiple joints; an x-ray demonstrated spinal narrowing and spurs, and primary caregivers observed multiple joint deformities.  (Doc. 9-8, pp. 36, 41, 45, 48).  Still, there is no medical evidence that suggests that the pain associated with these findings limited Ms. Higgins during the relevant time period to the extent that she indicated in her administrative hearing.  Because the ALJ properly applied the Eleventh Circuit pain standard and because substantial evidence supports his analysis under the standard, the Court must affirm the ALJ's decision.[10]

---

[10] Were the Court writing on a clean slate, the Court would have included in Ms. Higgins's RFC additional restrictions in the use of her upper and lower extremities because of her neuropathy and her RA.  But the Court cannot substitute its opinion for the ALJ's opinion, and evidence in the records from Dr. Hunt, Dr. Parker, and Dr. Mollohan adequately supports the ALJ's RFC analysis.

## CONCLUSION

For the reasons discussed above, the Court affirms the Commissioner's decision. The Court will enter a final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this August 25, 2022.

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE